**UNITED STATES DISTRICT COURT
FOR THE NORTHERN DISTRICT OF ILLINOIS
EASTERN DIVISION**

KEVIN REESE,                                )
                                            )
                    Plaintiff,              )          Case No. 23-cv-15823
                                            )
            v.                              )          Hon. Steven C. Seeger
                                            )
HUB GROUP INC.,                             )
                                            )
                    Defendant.              )
_____)

## MEMORANDUM OPINION AND ORDER

Kevin Reese had a number of performance problems when working at Hub Group, a logistics company. He missed shifts, arrived late, took unauthorized breaks, and studied for graduate school on the job. Reese received warning after warning, for incident after incident. The misadventures culminated in Reese barricading himself in a room, turning the lights off, and refusing to come out.

It was lights out for his job, too. Reese acted like he needed a time-out, and in the end, it was time's up. The company decided that it was time for Reese to go. It was the last straw, and it became his last day.

Reese responded by filing a complaint against Hub Group for race discrimination, retaliation, and a hostile work environment. After discovery, Hub Group filed for summary judgment.

For the reasons stated below, Hub Group's motion for summary judgment is granted.

### Non-Compliance with the Local Rules

Before diving in, the Court must address Reese's non-compliance with the Local Rules. The punchline is that Hub Group complied with the Local Rules, and Reese did not.

Local Rule 56.1 establishes the procedure for filing and opposing a motion for summary judgment. The moving party must provide a "statement of material facts that complies with [Local Rule] 56.1(d) and that attaches the cited evidentiary material." *See* L.R. 56.1(a)(2). The statement of facts must rest on evidence in the record, with user-friendly citations. "Each asserted fact must be supported by citation to the specific evidentiary material, including the specific page number, that supports it." *See* L.R. 56.1(d)(2).

The non-movant must respond to a motion for summary judgment by filing (1) a memorandum of law; and (2) a response to the movant's statement of facts. *See* L.R. 56.1(b)(2). The response to the movant's statement of facts must "consist of numbered paragraphs corresponding to the numbered paragraphs" in the movant's statement of facts. *See* L.R. 56.1(e)(1).

A non-movant cannot simply dispute a fact, without more. Disputing a fact requires citations to specific evidence in the record. "To dispute an asserted fact, a party must cite specific evidentiary material that controverts the fact and must concisely explain how the cited material controverts the asserted fact." *See* L.R. 56.1(e)(3).

Basically, the Local Rules require the non-movant to respond, paragraph by paragraph, to the facts in the movant's statement of facts. And if the non-movant disagrees with any of the movant's facts, the non-movant must cite evidence in the record to back up his position.

An incomplete response to a statement of facts has straightforward consequences. "Asserted facts may be deemed admitted if not controverted with specific citations to evidentiary material." *See* L.R. 56.1(e)(3).

The Local Rules also allow the non-moving party to add facts to the record by filing a statement of additional material facts. *See* L.R. 56.1(b)(3). The process for a statement of additional facts is basically the same as the process for a statement of facts.

Navigating the rules can be a challenge for pro se litigants. So the Local Rules require movants to give pro se litigants some extra tender loving care. Movants must provide a copy of Federal Rule 56 and Local Rule 56.1. What's more, movants must serve a "Notice to Unrepresented Litigants Opposing Summary Judgment," which explains the summary judgment procedure in plain English. *See* L.R. 56.2. That way, pro se parties have actual and constructive notice of their responsibilities under the Local Rules.

The Local Rule 56.2 Notice explains that disputing a fact requires the non-movant to "cite the specific page(s) of evidence that supports your position." *See* L.R. 56.2. The Notice includes forewarnings about the lack of compliance, too. "You must respond to each of the defendant's facts, paragraph by paragraph. **If you do not respond to a fact asserted by the defendant, the judge may decide that you have admitted that the fact is true**." *Id.* (bold in original).

Hub Group complied with the Local Rules by filing a statement of facts in support of its motion for summary judgment. *See* Def.'s Statement of Material Facts (Dckt. No. 54). Reese is pro se, and Hub Group served Reese with the Notice under Rule 56.2. *See* Def.'s Local Rule 56.2. Notice (Dckt. No. 55). So far, so good.

Reese didn't file a response to Hub Group's statement of facts. That is, he did not file a document that responded, paragraph by paragraph, to the facts stated in Hub Group's Rule 56.1 statement. The failure to respond means that all of Hub Group's facts are deemed admitted. *See* L.R. 56.1(e)(3).

Instead of filing a response, Reese filed something that he labeled a "statement of facts." *See* Pl.'s Statement of Material Facts (Dckt. No. 61). That's the wrong name. And the substance was wrong, too.

Only a movant can file a statement of facts. A non-movant can file a response to a statement of facts, and can file a statement of *additional* facts. Basically, a movant puts the ball in play, and a non-movant can hit the ball or can lob a ball of his own.

Putting the nomenclature aside, Reese's statement of facts doesn't do the job. Reese offered 37 paragraphs of his own. By the look of things, Reese attempted to add facts to the record and tell his own story. So the Court will treat the filing as a statement of additional facts. Even so, the filing did not come close to complying with the Local Rules.

Most of the paragraphs lack satisfactory citations to the evidentiary record. Reese offered 37 paragraphs, but 22 of the 37 paragraphs offer generic citations, without any pin cites. *Id.* at ¶¶ 1, 3–7, 9, 13, 17, 19, 21–26, 31–34, 36–37.

For example, Reese cited his own declaration 31 times.[1] But not a single citation included a page number or a paragraph number. *Id.* at ¶¶ 3–13, 15–17, 19–27, 29–37; *see also* Reese Decl. (Dckt. No. 62). Reese did not offer a "citation to the specific evidentiary material, including the specific page number, that supports it." *See* L.R. 56.1(d)(2).

The lack of specificity means that an intrepid reader would have to hunt through Reese's declaration to find the facts in question. And that's no small undertaking. That declaration is

---

[1] Reese called his filing an "affidavit," but it is actually a declaration. It is not an affidavit because Reese "did not swear to the content in the presence of someone authorized to administer oaths." *See Owens v. Hinsley*, 635 F.3d 950, 954 (7th Cir. 2011). But from an evidentiary standpoint, it makes no difference. The document satisfies the requirements of 28 U.S.C. § 1746. And a "declaration under § 1746 is equivalent to an affidavit for purposes of summary judgment." *See Owens*, 635 F.3d at 955.

long, spanning 78 paragraphs. That's a long ride. Searching for the supporting facts is a longer Citation Safari than most people have the stomach to endure.

Other paragraphs have a similar problem. Reese cited two other declarations. Sometimes Reese cited specific paragraphs. *See, e.g.,* Pl.'s Statement of Material Facts, at ¶¶ 8, 10, 15 (Dckt. No. 61). But most of the time, he cited those declarations as a whole, with no pin cites. *Id.* at ¶¶ 1–2, 5, 7, 13, 20, 22–27, 30.

Other paragraphs offered even less support. One paragraph included no citations at all. *Id.* at ¶ 18.

Tallying it up so far, Reese offered 37 paragraphs, and 23 of the 37 paragraphs contained inadequate citations or no citations at all.

The remaining 14 paragraphs were a mixed bag, at best. And the bag was full of holes. Some sentences included citations, but others did not. Some citations lacked pin cites. Some citations pointed to irrelevant material. Other citations referred to evidence that didn't support the paragraph. *Id.* at ¶¶ 2, 8, 10–12, 14–16, 20, 27–30, 35.

For example, paragraph two is half-compliant, half-non-compliant. It begins with the following sentence: "Capacity Planners are overtime exempt, salaried positions." *Id.* at ¶ 2. That sentence did include a citation to a declaration with a pin cite, meaning a specific paragraph. But the next sentence in paragraph two did not have a satisfactory citation. He cited his declaration, writ large.

Paragraph 29 is another good example. The paragraph describes the fallout from a day when Reese left work early without supervisor approval. *Id.* at ¶ 29. It contains four sentences.

The first sentence got off to a good start, relatively speaking. Reese stated that he arrived for work on time on January 14, 2022, "but left early without approval to take PTO." *Id.* Reese

5

cites two exhibits as support. *Id.* (citing exhibit 12 to the Wicks declaration, and citing a passage of the Reese deposition). The exhibit supports the fact in question, but the deposition testimony did not.

Things quickly went downhill in the second sentence of paragraph 29. Reese claimed that he complied with company policy. "In the warning memo, HR acknowledged that I acted in accordance with Hub policy when I communicated the request for immediate PTO by emailing HR and copying my manager, Groszek. Id. [sic]" *Id.* at ¶ 29.

The use of "*Id.*" suggests that the reader should look to the preceding citation for evidentiary support. And in fact, exhibit 12 to the Wicks declaration was the so-called warning memo.

Reese cited the right document for the wrong reason. The memo doesn't support Reese's characterization at all. The memo says the opposite of what Reese said it said.

The memo didn't say that Reese complied with company policy. It said that Reese *violated* company policy. Reese "walked off the job without properly notifying [his] manager prior to [his] departure. Although [Reese] did send an email at 6:34 pm to HR and copied Michael Groszek, [Reese's] manager, requested immediate PTO, it was without prior notice." *See* Wicks Decl., Ex. 12, at 288 of 305 (Dckt. No. 54-2).

The memo went on to explain how Reese violated company policy. Reese "exited the building at 6:35 pm without prior management approval to leave the workspace." *Id.* The memo forewarned that "Hub Group will not tolerate conduct of this nature." *Id.*

The third sentence of paragraph 29 quoted an email that Reese received on January 21, 2022, about his failure to work from his assigned workstation. But Reese added a gloss to the

email, saying that the company "informed [him] for the first time" about that policy. *See* Pl.'s Statement of Material Facts, at ¶ 29 (Dckt. No. 61). That gloss has no support.

The fourth sentence of paragraph 29 returns to an old problem. The sentence says that the company disciplined Reese for actions that were not prohibited. *Id.* at ¶ 29 ("Hub disciplined me for actions which, at the time, were not prohibited, and deemed his [sic] work only as 'insubordination' if not performed at his [sic] workstation ('Reese., Delc' [sic]).").

The citation leaves something to be desired, literally and figuratively. Once again, Reese cited to his declaration writ large, without pin cites. The citation left the reader wondering where to find support in a declaration that spans 78 paragraphs.

Viewed as a whole, paragraph 29 offers a little, but misses a lot. It establishes that Reese left early without permission. But it doesn't support the notion that Reese complied with company policy. And it doesn't support the notion that the company applied a new policy without prior notice.

Overall, the 14 paragraphs contain some sentences that pass muster, but also contain many sentences that lack supporting citations. All too often, the sentences lacked specific citations to supporting evidence. After rolling up its sleeves, getting into the weeds, and drilling down, this Court has identified a handful of sentences that passed muster.[2]

---

[2] Based on the Court's review, the following sentences in Reese's statement of facts include specific citations with sufficient evidentiary support: (1) the first sentence of paragraph 2 (but Reese made a typo – he cited ¶ 6 but should have cited ¶ 5); (2) the first sentence of paragraph 8; (3) the first sentence of paragraph 11; (4) the first sentence of paragraph 12; (5) the first and second sentence of paragraph 14; (6) the first sentence of paragraph 15; (7) the first sentence of paragraph 16; (8) the second sentence of paragraph 20; (9) the sixth sentence of paragraph 27; (10) the first, second, and third sentences of paragraph 28; (11) the first sentence of paragraph 29; (12) the second sentence of paragraph 30; and (13) the first sentence of paragraph 35.

In the end, none of those sentences make a difference. Many of the sentences made immaterial points that do not move the needle. All too often, they simply repeated points that Hub Group said anyway in its motion for summary judgment.

For example, one sentence states that Reese received the work-from-home policy. *Id.* at ¶ 12. Another sentence says that Reese did not show up for work on a scheduled workday. *Id.* at ¶ 14. And another sentence says that two of his supervisors "were concerned" that Reese "was not grasping his job duties." *Id.* at ¶ 15.

The bottom line is that Reese's statement of facts does not add anything material. Most of the paragraphs count for nothing because they lacked specific cites to the evidentiary record. Reese did offer supporting citations for a few stray sentences, but those sentences do not introduce any new material facts.

"Though courts are solicitous of pro se litigants, they may nonetheless require strict compliance with local rules." *Coleman v. Goodwill Indus. of Se. Wisconsin, Inc.*, 423 F. App'x 642, 643 (7th Cir. 2011). "It is well-settled that a plaintiff's pro se status does not excuse him from complying with federal and local procedural rules." *Parker v. Fern*, 2024 WL 1116092, at *2 (N.D. Ill. 2024); *see also Wilson v. Kautex, Inc.*, 371 F. App'x 663, 664 (7th Cir. 2010) ("[S]trictly enforcing Local Rule 56.1 was well within the district court's discretion, even though employee was pro se litigant."); *Collins v. Illinois*, 554 F.3d 693, 697 (7th Cir. 2009) ("[E]ven pro se litigants must follow procedural rules."); *McCladdie El v. United Airlines, Inc.*, 2025 WL 2084228, at *1 (N.D. Ill. 2025) ("Any party, including a pro se litigant, who fails to comply with Local Rule 56.1 does so at their own peril.").

The Court "will not go combing through the record" to find the basis of a factual dispute when one "is not clear." *See Morris v. Curves Int'l, Inc.*, 2019 WL 918481, at *2 (N.D. Ill.

2019); *see also Smith v. Lamz*, 321 F.3d 680, 683 (7th Cir. 2003) ("A district court is not required to 'wade through improper denials and legal argument in search of a genuinely disputed fact.'") (citation omitted). The reality is that this Court already did a lot of combing and wading.

At the summary judgment stage, the Court is not the finder of fact. And the Court should not have to be the hunter-of-facts, either. The Court should not have to treat the factual record like a claw machine in a video arcade, hoping to grab material facts from a disorganized pile.

The Local Rules explain the consequences of a failure to comply. And to top it off, this Court expressly reminded Reese that he needed to comply with the Local Rules. *See* 1/27/25 Order (Dckt. No. 58). The Court specifically forewarned that a "failure to comply can lead to appropriate relief, including treating certain facts as unopposed." *Id.*

The punchline is simple. Hub Group's statement of facts is deemed admitted because Reese did not respond. *See* L.R. 56.1(e)(3). On the flipside, Reese's statement of facts does not have a bearing on the outcome of the motion. Most of the paragraphs count for nothing because Reese did not comply with the Local Rules. A few sentences did pass muster, but they are immaterial.

## Background

### I.    The Employment Relationship

Hub Group performs transportation and logistical management services throughout the country. *See* Def.'s Statement of Material Facts, at ¶ 1 (Dckt. No. 54). It's in the business of getting things from here to there.

Hub Group employs "Capacity Planners" at various offices, including at its headquarters in Oak Brook, Illinois. *Id.* at ¶ 2. Capacity Planners manage an assigned market by directing and dispatching Hub Group's legion of truck drivers. *Id.* at ¶ 3.

Planners communicate with drivers daily. *Id.* at ¶ 4. They use online messaging platforms and phone calls to connect with drivers who need assistance with mechanical failures, route changes, and other issues. *Id.* Hub Group expects Planners to provide exceptional customer service and treat drivers with professionalism. *Id.*

Hub Group hired Kevin Reese, a black man, as a Capacity Planner in August 2021. *Id.* at ¶ 5. Reese joined a diverse team. The Capacity Planners included six black employees, three white employees, and one Asian-American employee. *Id.* at ¶ 12.

Reese's offer letter stated that he would earn $60,000 per year. *Id.* at ¶ 6. Reese was one of the highest-paid Capacity Planners in Oak Brook. *Id.* at ¶ 13.

Hub Group assigned Reese a workstation located with the other Capacity Planners. *Id.* at ¶ 38. Hub Group joined the after-hours team at the Oak Brook headquarters. *Id.* Reese worked 12-hour shifts, from 6:00 p.m. to 6:00 a.m. *Id.* at ¶ 9.

To balance the long hours, Hub Group scheduled Reese to work three shifts for three weeks, followed by a week where Reese worked four shifts. *Id.* at ¶ 10. So, Reese worked either nine or ten days during any three-week period. *Id.*

Three individuals supervised Reese: Michael Groszek, James Losos, and Robert Weisberg. Groszek and Losos are the Managers of After Hours Capacity Planners, and Weisberg is the Director of After Hours Intermodal Operations. *Id.* at ¶ 11.

Working at Hub Group wasn't the only thing on Reese's mind and on his plate. While working for Hub Group, Reese also studied as a full-time graduate student at DePaul University. *Id.* at ¶ 24.

10

On his first day, Reese signed an acknowledgment that he had received the employee handbook. *Id.* at ¶ 7. The handbook spanned nearly 200 pages, and detailed all of Hub Group's policies and benefits.

In October 2021, a few months after Reese joined the company, Hub Group updated its employee handbook. *Id.* at ¶ 8. Reese electronically signed and acknowledged receipt of the updated handbook that same month. *Id.*

Reese received paid time off at Hub Group. *Id.* at ¶ 15. But the amount of paid time off became a bone of contention. There was arguable tension between Reese's offer letter and the handbooks.

Reese's offer letter said that he would earn "3 weeks of paid time off (PTO)." *See* Wicks Decl., Ex. B, at 12 of 305 (Dckt. No. 54-2).

Both editions of the employee handbook covered the PTO policy. The handbook set caps on the amount of time that an employee could earn. There was a monthly cap, and an annual cap. Specifically, the monthly cap limited employees to 10 hours of PTO per month. *See* Wicks Decl., Ex. C, at 41 of 305 (Dckt. No. 54-2); Wicks Decl., Ex. D, at 220 of 305 (Dckt. No. 54-2). The annual cap limited employees to 15 days of PTO per year. *Id.*

So, under the offer letter, Reese would get three weeks of PTO. But under the handbook, Reese could earn a maximum of two weeks of PTO (if the company used the monthly cap, because Reese worked 12-hour days).

For purposes of summary judgment, the granularity is immaterial. Suffice it to say that Reese took issue with how the company calculated his PTO.[3]

---

[3] If you want granularity, chew on this footnote. The dispute involved two different issues. The first issue involved a potential discrepancy between the offer letter and the handbooks. The second issue involved how to calculate the PTO. The handbook used two different metrics to calculate PTO. The handbook set the maximum number of *hours* of PTO that an employee could earn per *month*. And the

Employees cannot take paid time off whenever they feel like it. A manager must approve all PTO, and PTO is scheduled at the convenience of an employee's department. *Id.* at ¶ 16; Wicks Decl., Ex. C, at 42 of 305 (Dckt. No. 54-2); Wicks Decl., Ex. D, at 221 of 305 (Dckt. No. 54-2).

The handbook described other benefits, too. Hub Group generally entitles employees to take off certain holidays with pay, like Thanksgiving and Christmas. *See* Def.'s Statement of Material Facts, at ¶ 17 (Dckt. No. 54). But the handbook noted that "some employees may be required to work" on holidays. *Id.* However, those employes could "choose an alternative day off" instead. *Id.* Employees stuck working on holidays do not receive a pay premium. *Id.* at ¶ 18.

Hub Group also provides teleworking opportunities. *Id.* at ¶ 19. But telework must be scheduled and approved. Approval depends on various factors, like an employee's performance history. *Id.* Hub Group detailed its teleworking policy in a separate document, and Reese signed the policy. *Id.* at ¶ 20. Capacity Planners could work from home once per month. *Id.* at ¶ 33.

## II.    The Rocky Road

Reese didn't get off to a fast start. Before long, he started having performance problems on the job.

---

handbook set the maximum number of *days* of PTO that an employee could earn per *year*. An employee accruing ten hours of PTO a month earns 120 hours annually. For employees working eight-hour days, that would translate to 15 days of PTO (*i.e.*, 120 hours ÷ 8 hours/day = 15 days). A day is 24 hours, but not all workdays are created equal. Some people have eight-hour workdays. And other people – like Reese – have longer workdays. Reese worked twelve-hour days. So, if Reese earned 120 hours of PTO annually, that PTO would translate into 10 workdays, not 15 workdays. (*i.e.*, 120 hours ÷ 12 hours/day = 10 days). So Reese would only accrue 10 days of PTO a year, not 15 days. *See* Def.'s Statement of Material Facts, at ¶ 15 (Dckt. No. 54). It's the same amount of time, but not the same amount of workdays.

In October 2021, after two months on the job, Reese volunteered for extra shifts in October, November, and December. *Id.* at ¶ 21. So, Hub Group assigned Reese more shifts, including one for October 20. *Id.* But on October 20, Reese never showed up for work. *Id.*

The next day, James Losos (again, one of the managers) had a one-on-one meeting with Reese about his absence. *Id.* After their meeting, Losos emailed Reese, emphasizing that the company needed to see improvements in his performance. *Id.* ¶ 22. Losos told Reese to improve his "communication especially through email," and get better at "updating [truck] driver's workflow's [sic] properly." *Id.*; *see also* Groszek Decl., Ex. 1, at 9 of 31 (Dckt. No. 54-3).

Around this time, Michael Groszek (again, another manager) and Losos feared that Reese was not grasping his job duties because Reese regularly studied for graduate school during his shifts. *See* Def.'s Statement of Material Facts, at ¶¶ 23, 25 (Dckt. No. 54). In his email, Losos also reminded Reese to study only during breaks. *Id.* at ¶ 25.

On October 29, Groszek received a complaint from a truck driver about Reese. *Id.* at ¶ 26. The driver said that Reese had scolded the driver, telling him: "don't ever talk to me like I work for you." *Id.* Reese admitted making this statement to the driver. *Id.*

That same day, Groszek emailed Robert Weisberg (again, the Director of After Hours Intermodal Operations). *Id.* at ¶ 27. Groszek lamented that he was losing patience with Reese. *Id.*

The email highlighted a bunch of problems. Reese was "downright insulting" to other Capacity Planners. *Id.* Reese regularly did homework or watched movies during shifts. *Id.* And he lacked basic knowledge required for his role. *Id.*

On November 4, Reese received his first formal, written warning. *Id.* at ¶ 28. The warning reprimanded Reese for "conducting personal business during work time." *Id.* But despite the warning, Reese continued performing schoolwork during his shifts. *Id.*

On December 6, Reese once again failed to update a truck driver's workflow. *Id.* at ¶ 30. And Reese's emails to the driver were "out of line and disrespectful." *Id.*

So, Reese received a second written warning on December 16. *Id.* at ¶ 29. Hub Group warned Reese about his failure to perform his job duties. *Id.*

In an addendum to the warning, Groszek detailed 20 different negative interactions that Reese had had with his coworkers between September 23 and December 16. *Id.* at ¶ 31. Based on those interactions, Groszek believed that Reese had extensive performance failures. *Id.*

On December 24, Reese took a two-hour lunch break. *Id.* at ¶ 32. Reese did not receive permission for a longer lunch break, and his supervisors could not reach him during his absence. *Id.*

Later that day, Groszek emailed Reese to "coach" him. *Id.* Groszek emphasized the inappropriateness of taking a two-hour lunch break without approval. *See* Groszek Decl., at ¶ 11 (Dckt. No. 54-3).

Throughout his tenure, Reese abused teleworking privileges. At first, Hub Group allowed Reese to telework once per month, which was customary for Capacity Planners. *See* Def.'s Statement of Material Facts, at ¶¶ 33–34 (Dckt. No. 54).

Telework become tele-not-a-lotta-work. By December, Reese began logging in late when teleworking. *Id.* at ¶ 35. Other times, Reese would disappear for hours, unreachable by phone or email. *Id.*

14

When confronted, Reese blamed his tardiness or absence on connectivity issues or Hub Group's IT team. *Id.* at ¶ 36. So, Hub Group connected Reese with one of its IT team members, Joe Scola. *Id.* Scola believed that Reese's remote work issues came from Reese's use of a mobile hotspot for internet, rather than a more reliable Wi-Fi connection. *Id.* Scola did not identify any hardware errors attributable to Hub Group. *Id.*

Despite Scola's help, Reese continued having performance problems and alleged difficulties connecting to work remotely. *Id.* at ¶ 37. So, Hub Group pulled the plug (as it were). The company revoked his teleworking privileges on December 22, 2021. *Id.*

In January 2022, Reese raised several complaints to Jenna Wicks, the Vice President of Human Resources. *Id.* at ¶ 62; *see also* Wicks Decl., at ¶¶ 2, 18 (Dckt. No. 54-2). Reese complained that (1) he could not work from home on Christmas; (2) Groszek allegedly denied him telework during Christmas and New Years, when Reese had COVID-19; (3) Weisberg did not respond promptly to his text messages; and (4) Reese was denied a break on December 29, despite only working six of his twelve scheduled hours. *See* Def.'s Statement of Material Facts, at ¶ 62 (Dckt. No. 54).

Wicks investigated his complaints, and found them baseless. *Id.* at ¶ 63.

Hub Group denied his telework requests for two reasons. Reese had surpassed his permitted telework days in December, and in any event, the company had revoked his teleworking privileges before Christmas. *See* Wicks Decl., at ¶ 18 (Dckt. No. 54-2). Weisberg didn't respond right away for good reason, too – he was taking paid time off. *Id.*

Reese's other complaints had no basis in fact. Hub Group allowed Reese to work from home between the holidays while sick with COVID-19. *Id.* And Reese took a one-hour break on December 29, even though he did not work a full shift and was not entitled to a break. *Id.*

15

Wicks spoke to Reese numerous times, and Reese never complained about race discrimination. *Id.* at ¶ 19.

Meanwhile, Reese's performance issues persisted.

On January 13, 2022, Reese arrived late for work. *See* Def.'s Statement of Material Facts, at ¶ 39 (Dckt. No. 54). Later that day, Reese went missing from his workstation for 45 minutes. *Id.* at ¶ 40. Weisberg searched for Reese, and found him in a training room with the lights off and the door closed. *Id.*

Weisberg asked Reese to return to his desk. *Id.* Reese refused, stating that when he worked at his desk, he could not complete his schoolwork. *Id.*

The next day, Reese left his workstation for 30 minutes, without notice or approval. *Id.* at ¶ 42. Again, Weisberg told Reese that he could not leave his desk for extended periods of time. *Id.*

 Later that day, Reese showed up for his 6:00 p.m. shift on time. *Id.* at ¶ 45.[4] But at 6:34 p.m. – only 34 minutes into his shift – Reese requested immediate PTO. *Id.* at ¶ 46. Hub Group denied the request since his shift had already started, and Hub Group was short-staffed. *Id.*

Reese left work anyway. *Id.* Reese said he wanted to leave because Weisberg recently admonished him for leaving his desk. *Id.* at ¶ 47. Apparently, the criticism made him want to go home. *Id.*

One of Reese's coworkers finally had enough of Reese's antics. On January 14, another Capacity Planner (Ahmed Abu-Swailem) submitted a "Coworker Complaint" to the human resources team. *Id.* at ¶ 43.

---

[4] The record is unclear about when these separate instances of insubordination happened. Reese worked shifts from 6:00 p.m. to 6:00 a.m. The Court understands Reese to have been late, away from his desk for 45 minutes, and away again for 30 minutes during the same shift, but across two days (January 13 and 14). Then, later on January 14, Reese showed up on-time for his shift beginning at 6:00 p.m.

Abu-Swailem detailed Reese's behavior on the previous day, January 13. He noted that Reese did not set up his workstation. *Id.* at ¶ 44. Reese's laptop remained closed, and he was gone his whole shift. *Id.* So, the truck drivers who were assigned to Reese had to call other Capacity Planners for help. *Id.* They had to carry his load.

Abu-Swailem said that Reese's poor performance negatively affected the other Capacity Planners. *Id.* He complained that Reese was habitually late for work, and when he did show up, he did little or no work. *Id.* Abu-Swailem believed that Reese had received "special treatment" and "free pass[es]" for his misconduct. *Id.*; *see also* Wicks Decl., Ex. 11, at 282–85 of 305 (Dckt. No. 54-2).

On January 21, Hub Group issued Reese a final written warning. *See* Def.'s Statement of Material Facts, at ¶ 48 (Dckt. No. 54). The warning followed Reese's unapproved, early departure on January 14. *Id.* It informed Reese that any additional attendance or punctuality issues could lead to his termination. *Id.*

## III. The February 4 Incident

Reese did not heed the warning. Things soon came to a head.

On February 4, Reese arrived late for work. *Id.* at ¶ 49. Weisberg promptly told Reese that he would inform HR about Reese's tardiness. *Id.* at ¶ 50. Reese became very upset. *Id.* at ¶ 51. Then, he asked to use PTO for the remainder of his shift. *Id.*

Weisberg denied Reese's request for several reasons. *Id.* at ¶ 52. First, Reese did not provide a reason for needing PTO. *Id.* Second, Reese did not give enough notice of his request. *Id.* Third, Hub Group needed Reese's services during the shift. *Id.*

Despite the denial, Reese began to leave. *Id.* at ¶ 53. So, Weisberg informed Reese that if he left, he would violate his final warning. *Id.*

17

Reese didn't respond well to the reprimand. Reese went to a training room, and sat alone in the dark. *Id.*

Weisberg asked Reese to return to his desk. *Id.* at ¶ 54. Reese refused. *Id.*

Then, Reese called Jenna Wicks. *Id.* at ¶ 55. Wicks heard the ensuing argument between Weisberg and Reese. *See* Wicks Decl., at ¶ 20 (Dckt. No. 54-2). She remained on the phone the entire time. *See* Reese Dep. Tr., at 73:14-21 (Dckt. No. 54-5).

Weisberg encouraged Reese to return to his desk. *See* Wicks Decl., at ¶ 20 (Dckt. No. 54-2). When Reese refused, Weisberg raised his voice. *Id.* But Weisberg never touched Reese at any point. *See* Def.'s Statement of Material Facts, at ¶ 66 (Dckt. No. 54).

The downward spiral continued. At some point, someone called security. *See* Reese Dep. Tr., at 70:21 (Dckt. No. 54-5). The argument grew more heated, and Wicks suggested that Weisberg allow Reese to leave. *See* Wicks Decl., at ¶ 20 (Dckt. No. 54-2).

At some point, Reese left the building, seemingly without additional commotion. *See* Groszek Decl., Ex. 8, at 30 of 31 (Dckt. No. 54-3).

Wicks investigated the incident. She determined that Reese had arrived late, violated company policy, and refused to return to his workstation without justification. *See* Def.'s Statement of Material Facts, at ¶ 59 (Dckt. No. 54).

During his deposition, Reese evaded questions about whether Weisberg targeted his race during their argument. *See* Reese Dep. Tr., at 223:25 – 224:23 (Dckt. No. 54-4); *see also* Reese Dep. Tr., at 69:11 – 70:3 (Dckt. No. 54-5). But Wicks never heard Weisberg mention Reese's race or use any derogatory language. *See* Wicks Decl., at ¶ 20 (Dckt. No. 54-2). In fact, Wicks never heard Weisberg so much as curse. *Id.*

During the incident, Wicks never heard Reese complain that he was being treated differently because of his race. *Id.*

Reese soon left the building for good. Hub Group fired Reese shortly after the February 4 incident. *See* Def.'s Statement of Material Facts, at ¶ 60 (Dckt. No. 54).

Reese obtained a right-to-sue letter from the EEOC, and then sued. Reese filed a complaint against Hub Group, and later amended the complaint. *See* Cplt. (Dckt. No. 1); Am. Cplt. (Dckt. No. 10). He requested $100,000,000 in damages. *See* 2/26/24 Status Report (Dckt. No. 30).

The amended complaint contains a handful of claims. Reese simply checked the boxes on the form complaint. The actual number of claims depends on how you count them (that is, whether a race discrimination claim under Title VII and section 1981 counts as one claim or two). Reese brings race discrimination, retaliation, and hostile work environment claims under Title VII and section 1981.

As an aside, the amended complaint was somewhere between skeletal and bare bones. Reese used the form that the Northern District of Illinois uses for complaints in employment discrimination cases. Reese checked a few boxes, and then attached a bunch of exhibits. Apart from the exhibits, there wasn't any meat on the bone.

The form complaint didn't offer any facts to describe what happened. Question #13 asked for the "facts supporting the plaintiff's claim of discrimination." Reese left it almost blank, simply writing "see attachments." *See* Am. Cplt., at 5 (Dckt. No. 10).

One wonders if the form complies with the Federal Rules. Rule 10 requires a party to "state its claims or defenses in numbered paragraphs." *See* Fed. R. Civ. P. 10(b). That requirement serves a purpose. It forces a plaintiff to give notice of what the claim is about, and it

gives a defendant an opportunity to admit or deny facts, one by one. The back-and-forth, give-and-take, admit-or-deny process helps to streamline cases.

The form in question puts all of that by the wayside. The form simply asks plaintiffs to recite supporting facts, and then offers five blank lines. The blank space encourages plaintiffs to offer any facts in one fell swoop, in a single payload. Whatever merit there might be in that approach, it is hard to see how it complies with the requirement that a complaint must contain "numbered paragraphs." *See* Fed. R. Civ. P. 10(b).

Putting that aside, the complaint survived the motion-to-dismiss stage, and the parties embarked on discovery. Discovery did not go smoothly.

Reese called this Court's chambers a few times, out of the blue, asking if he had to sit for deposition. The answer wasn't a surprise. *See* 10/15/24 Order (Dckt. No. 38) ("In the last few days, the Courts staff has received phone calls from Plaintiff about whether Plaintiff must sit for deposition. To answer Plaintiff's question, Plaintiff must sit for deposition. Plaintiff cannot file a lawsuit and refuse to answer questions about the lawsuit.").

During his deposition, Reese refused to answer certain questions, prompting a motion for sanctions. *See* 10/21/24 Mtn. (Dckt. No. 41). This Court held a hearing and explained that Reese had to answer questions. *See* 10/23/24 Order (Dckt. No. 43). When the deposition resumed the following month, Reese once again refused to answer questions, prompting another call to chambers and another order. *See* 11/14/24 Order (Dckt. No. 45).

After the close of discovery, Hub Group moved for summary judgment.

### Legal Standard

A district court "shall grant" summary judgment "if the movant shows that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of

law." *See* Fed. R. Civ. P. 56(a). A genuine dispute of material fact exists if "the evidence is such that a reasonable jury could return a verdict for the nonmoving party." *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 248 (1986).

The party seeking summary judgment has the burden of establishing that there is no genuine dispute as to any material fact. *See Celotex Corp. v. Catrett*, 477 U.S. 317, 323 (1986). To survive summary judgment, the opposing party must go beyond the pleadings and identify specific facts showing the existence of a genuine issue for trial. *See Anderson*, 477 U.S. at 256.

The Court construes all facts in the light most favorable to the nonmoving party, giving the nonmoving party the benefit of all reasonable inferences. *See Chaib v. Geo Grp., Inc.*, 819 F.3d 337, 341 (7th Cir. 2016). The Court does not weigh the evidence, judge credibility, or determine the truth of the matter, but rather determines only whether a genuine issue of triable fact exists. *See Nat'l Athletic Sportswear, Inc. v. Westfield Ins. Co.*, 528 F.3d 508, 512 (7th Cir. 2008).

Summary judgment is appropriate if, on the evidence provided, no reasonable jury could return a verdict in favor of the non-movant. *See Celotex Corp.*, 477 U.S. at 322; *Gordon v. FedEx Freight, Inc.*, 674 F.3d 769, 772–73 (7th Cir. 2012).

**Analysis**

Reese brings a basket of claims under Title VII and section 1981, including race discrimination, retaliation, and a hostile work environment. The same legal standard applies to both statutes, so the Court will treat them together. *See Saud v. DePaul Univ.*, 154 F.4th 563, 567 (7th Cir. 2025) (collecting cases); *Smith v. Chicago Transit Auth.*, 806 F.3d 900, 904 (7th Cir. 2015) ("The legal analysis for discrimination claims under Title VII and § 1981 is

identical."); *Humphries v. CBOCS W., Inc.*, 474 F.3d 387, 403–04 (7th Cir. 2007) (collecting cases).

## I.     Race Discrimination

The first claim is race discrimination under Title VII and section 1981. Reese alleges that the company fired him because he is black.

Title VII makes it unlawful for employers to "fail or refuse to hire or to discharge any individual, or otherwise to discriminate against any individual with respect to his compensation, terms, conditions, or privileges of employment, because of such individual's race, color, religion, sex, or national origin." *See* 42 U.S.C. § 2000e-2(a)(1); *see also* 42 U.S.C. § 1981.

"To defeat a motion for summary judgment on the merits of a Title VII race-discrimination claim, a plaintiff must produce evidence that would let a reasonable factfinder find that her race caused an adverse employment action." *See Paterakos v. City of Chicago*, 147 F.4th 787, 795 (7th Cir. 2025); *see also Mitchell v. Exxon Mobil Corp.*, 143 F.4th 800, 809 (7th Cir. 2025) ("[W]hen a defendant moves for summary judgment, the singular question for the district court is whether the plaintiff has introduced evidence that would permit a reasonable factfinder to conclude that the plaintiff's race . . . caused the discharge or other adverse employment action.") (cleaned up).

"To succeed on a Title VII [or section 1981] discrimination claim, an employee must prove (1) that she is a member of a protected class, (2) that she suffered an adverse employment action, and (3) causation." *See Lewis v. Indiana Wesleyan Univ.*, 36 F.4th 755, 759 (7th Cir. 2022); *see also Saud*, 154 F.4th at 567.

As an aside, that recitation of the elements might need some fine-tuning. The first element is that the plaintiff is a "member of a protected class." *Id.* But everyone has a race, and in that sense, *everyone* is a member of a protected class.

Race is a protected category, and anyone and everyone can bring a race discrimination claim. *See Ames v. Ohio Dep't of Youth Services*, 605 U.S. 303 (2025); *Paterakos*, 147 F.4th at 795. Saying that someone is a member of a protected class doesn't say anything, because the circle of protection covers everyone. Asking if a person is a member of a protected class in a race-discrimination case isn't much better than asking if a person is a person.

The question is not whether a person is a member of a protected class. Everyone is. Everyone has a race, a sex, and so on. The question is whether an employer discriminated against a person based on a protected category, as opposed to something else (say, based on whether the person likes pineapple on pizza).

A plaintiff may carry his burden a few different ways. One option is the familiar burden-shifting framework under *McDonnell Douglas Corp. v. Green*, 411 U.S. 792 (1973). Another possibility is the totality-of-the-circumstances approach explained in *Ortiz v. Werner Enterprises, Inc.*, 834 F.3d 760 (7th Cir. 2016).

The two routes go to the same place. "Although there are many tests and rubrics for viewing discrimination claims, it is important to recall that, at the end of the day they are all merely convenient ways to organize our thoughts." *Brooks v. Avancez*, 39 F.4th 424, 433 (7th Cir. 2022).

The objective is to figure out if a plaintiff has enough evidence of discrimination to support a verdict in his or her favor by a reasonable jury. The "only question that matters" is "whether a reasonable fact-finder could conclude that a plaintiff suffered the adverse

employment action because of her membership in a protected class." *See Mitchell*, 143 F.4th at 809.

Reese invoked the *McDonnell Douglas* framework, and did not make an argument under the holistic approach under *Ortiz*. *See* Pl.'s Resp. in Opp'n. to Def.'s Mtn. for Summ. J., at 4–6 of 55 (Dckt. No. 59). So this Court will go down the same road.

Under *McDonnell Douglas*, a plaintiff has the initial burden "to establish a prima facie case of discrimination, after which the burden shifts to the defendant to provide a legitimate justification, before finally shifting back to the plaintiff to establish that such justification was pretextual." *Dunlevy v. Langfelder*, 52 F.4th 349, 353 (7th Cir. 2022).

There are three steps, and Reese trips over each of them. He did not present a prima facie case of discrimination. The company had a legitimate reason to let him go. And Reese did not offer evidence that the reason was phony.

## A.      Prima Facie Case

The first step is presenting a prima facie case of discrimination. To make a prima facie case, Reese must show that (1) he is a member of a protected class; (2) he met his employer's legitimate job expectations; (3) he suffered an adverse employment action; and (4) similarly situated employees outside the protected class received more favorable treatment. *See Kuttner v. Zarumba*, 819 F.3d 970, 976 (7th Cir. 2016).

Reese satisfied the first and third elements. Reese is black, and race is a protected category. And termination is an adverse employment action. *See Revies v. Illinois State Police*, 29 F.4th 887, 894 (7th Cir. 2022).

Reese did not come close to satisfying the other two elements. For starters, Reese did not meet Hub Group's legitimate job expectations. Frankly, it is hard to know what else Reese could have done to let the company down.

For months, Reese frequently arrived late to work and left early in the middle of shifts. *See* Def.'s Statement of Material Facts, at ¶¶ 21, 32, 35, 39–40, 45–46, 49 (Dckt. No. 54). He treated other employees poorly. *Id.* at ¶¶ 26–27, 30, 43–44. He regularly completed schoolwork during work despite repeated instructions to stop. *Id.* at ¶¶ 25, 27–28. He disappeared during shifts. *Id.* at ¶¶ 39–40, 42. He took unauthorized PTO. *Id.* at ¶¶ 46–47, 51–54. And despite several warnings, Reese's behavior never improved.

The poor performance did not escape the attention of his bosses. Reese's supervisors remarked that Reese struggled with basic job duties, and that he did not perform well. *Id.* at ¶¶ 22, 23, 25 27, 29–30.

A tardy and insubordinate employee does not meet the employer's legitimate job expectations. *See Williams v. Airborne Exp., Inc.*, 521 F.3d 765, 768 (7th Cir. 2008); *Everroad v. Scott Truck Sys., Inc.*, 604 F.3d 471, 478 (7th Cir. 2010); *Elliott v. Dedelow*, 115 F. App'x 881, 883 (7th Cir. 2004); *Masupha v. Mineta*, 551 F. Supp. 2d 730, 739 (N.D. Ill. 2008) (collecting cases); *Rabenhorst v. Mayorkas*, 2024 WL 230936, at *4 (N.D. Ill. 2024); *Culbert v. Hilti, Inc.*, 2011 WL 5878369, at *9 (N.D. Ill. 2011).

An employee who violates a company's established policies does not meet the employer's legitimate job expectations, either. *See Anders v. Waste Mgmt. of Wisconsin*, 463 F.3d 670, 676 (7th Cir. 2006). And an employee who remains insubordinate despite getting disciplined fails to meet an employer's legitimate job expectations. *See Williams*, 521 F.3d at 768.

25

Reese does not deny his litany of performance issues. Instead, he argues that Hub Group has "no performance metrics [that] show any decline in" his performance. *See* Pl.'s Resp. in Opp'n. to Def.'s Mtn. for Summ. J., at 4 of 55 (Dckt. No. 59).

His argument goes nowhere. Hub Group provided extensive evidence about Reese's poor performance, including behavioral problems and absenteeism. If his performance didn't decline over time, that's because his performance was bad from the start.

Reese also failed to identify any comparators who received better treatment. Reese argues that Hub Group treated him differently than other Capacity Planners. *See* Pl.'s Resp. in Opp'n. to Def.'s Mtn. for Summ. J., at 5 of 55 (Dckt. No. 59). Specifically, Reese says that Hub Group denied Reese, and only Reese, teleworking privileges and punished him for working in the training room, rather than his workstation. *Id.*

"Although they need not be identically positioned, similarly situated employees must be directly comparable to the plaintiff in all material respects." *See Igaski v. Illinois Dep't of Fin. and Prof. Reg.*, 988 F.3d 948, 958 (7th Cir. 2021) (cleaned up). "To prevail by showing a similarly situated employee was treated differently, a plaintiff must show the purported comparator was 'directly comparable to her in all material respects' so as to 'eliminate other possible explanatory variables.'" *See Gamble v. County of Cook*, 106 F.4th 622, 626 (7th Cir. 2024) (citation omitted).

"Whether a comparator is similarly situated is typically a question for the fact finder, unless, of course, the plaintiff has no evidence from which a reasonable fact finder could conclude that the plaintiff met his burden on this issue." *See Johnson v. Advocate Health and Hospitals Corp.*, 892 F.3d 887, 895 (7th Cir. 2018).

Reese failed to identify any similarly situated employees who received better treatment. Reese does not point to any other employee with a comparable performance record who nonetheless skated by.

For example, Reese does not name any other Capacity Planner who continued to telework, despite comparable abuses. It is not enough to say that the company allowed other employees to telework. At the very least, Reese would need to present evidence that the company allowed non-black employees to telework, even though they had comparable performance problems. Reese presented no such evidence.

The same conclusion holds true across the board, on all other aspects of his employment. Reese does not identify anyone else who was able to take spur-of-the-moment PTO. And Reese admits that he never saw another employee working away from their assigned desk. *See* Reese Dep. Tr., at 37:2-10 (Dckt. 54-5). Plus, Reese told his supervisor that he liked working in the training room since he could do schoolwork there without being asked to stop. *See* Def.'s Statement of Material Facts, at ¶ 40 (Dckt. No. 54).

Overall, Reese has not come close to presenting a prima facia case. He fell far short of the company's job expectations. And the company didn't treat him worse than anyone else standing in the same shoes.

## B. Legitimate Justification

The next question is whether the employer had a legitimate reason for the adverse employment action. When a plaintiff satisfies his initial burden, the burden flips to the employer to provide a legitimate, non-discriminatory reason for the employment decision. *See Mitchell*, 143 F.4th at 809. This "is a light burden." *Id.*

27

The record establishes that Hub Group had more-than-ample reason to show Reese the door. He showed up late, zoned out, tuned out, turned off the lights, and faded away. If anything, it is a wonder that Reese lasted so long.

### C.      Pretext

The last question is pretext. Hub Group had a legitimate reason to let Reese go. So the burden flips back to Reese to show that the reason is a pretext for discrimination. *See Dunlevy*, 52 F.4th at 353.

"Pretext is a lie, specifically a phony reason for some action, not just faulty reasoning or mistaken judgment on the part of the employer." *See Napier v. Orchard Sch. Found.*, 137 F.4th 884, 892 (7th Cir. 2025). A plaintiff must show that the employer's stated reason "was not the honest reason for the employer's" decision to fire them. *See Paterakos*, 147 F.4th at 797. Put another way, Reese must show that Hub Group "did not honestly believe [its] reasons for terminating" him. *See Cung Hnin v. TOA (USA), LLC*, 751 F.3d 499, 507 (7th Cir. 2014).

"Pretext can be proven, among other ways, by evidence (1) that the employer's explanation has no basis in fact; (2) of ambiguous or suggestive comments or conduct; or (3) of better treatment of people similarly situated but for the protected characteristic." *Paterakos*, 147 F.4th at 797.

Reese argues that "Hub's stated reasons for its actions are demonstrably pretextual." *See* Pl.'s Resp. in Opp'n. to Def.'s Mtn. for Summ. J., at 6 of 55 (Dckt. No. 59). Reese says Hub Group "produced no metrics showing declining performance." *Id.*

By the sound of things, Reese challenges the merits of the company's decision. But a federal court "'is not a super personnel department that second-guesses employers' business judgments.'" *See Grant v. Trustees of Indiana Univ.*, 870 F.3d 562, 570 (7th Cir. 2017) (citation

omitted). "The focus is not on the wisdom of the decision, but on its genuineness." *Galvan v. Indiana*, 117 F.4th 935, 939 (7th Cir. 2024).

Reese argues that "Hub's shifting explanations for its actions suggest pretext." *See* Pl.'s Resp. in Opp'n. to Def.'s Mtn. for Summ. J., at 6 of 55 (Dckt. No. 59). According to Reese, Hub Group told the Illinois Unemployment Office that it fired Reese for attendance issues, but in this lawsuit, Hub Group claims that it fired him for performance issues. *Id.*

That argument is a road to nowhere. There isn't a lot of daylight between attendance issues and performance issues. The former is a subset of the latter – Reese had a lot of performance issues, including a failure to show up for work on time.

And in any event, an employer can have several reasons for letting an employee go. "Merely providing multiple, or additional, reasons for an adverse employment decision does not establish pretext." *Saud*, 154 F.4th at 569 (collecting cases).

"Pretext does not exist if the decisionmaker honestly believed the nondiscriminatory reason given by an employer for an adverse employment action." *Downing v. Abbott Laboratories*, 48 F.4th 793, 804–05 (7th Cir. 2022) (internal quotation marks and citations omitted). Here, Reese provided no evidence that Hub Group gave a phony reason for his termination.

Viewing the record as a whole, in a light favorable to Reese as the non-movant, Reese has not come close to presenting evidence of race discrimination. On this record, no reasonable jury could find that Hub Group discriminated against Reese because of his race. Hub Group is entitled to summary judgment on the race discrimination claim.

## II.     Retaliation

The next claim is retaliation.  Title VII prohibits an employer from discriminating against an employee "because he has opposed any practice made an unlawful employment practice by this subchapter, or because he has made a charge, testified, assisted, or participated in any manner in an investigation, proceeding, or hearing[.]"  *See* 42 U.S.C. § 2000e-3(a).

To survive summary judgment, Reese "must offer evidence from which a reasonable jury could find: '(1) he engaged in an activity protected by the statute; (2) he suffered an adverse employment action; and (3) there is a causal link between the protected activity and the adverse action.'"  *See Lesiv v. Illinois Cent. R.R. Co.*, 39 F.4th 903, 911 (7th Cir. 2022) (quoting *Lewis v. Wilkie*, 909 F.3d 858, 866 (7th Cir. 2018)).  "Failure to satisfy any one element of the *prima facie* case is fatal to an employee's retaliation claim."  *Sublett v. John Wiley & Sons, Inc.*, 463 F.3d 731, 740 (7th Cir. 2006).

Reese contends that the company retaliated against him for complaining about the denial of PTO, holiday pay, and telework.  *See* Pl.'s Resp. in Opp'n. to Def.'s Mtn. for Summ. J., at 7 of 55 (Dckt. No. 59).  That argument goes nowhere fast.

The statute does not prohibit retaliation writ large.  It prohibits retaliation for engaging in a protected activity.  A plaintiff engages in a "[p]rotected activity" when he or she takes "some step in opposition to a form of discrimination that [Title VII] prohibits."  *See O'Leary v. Accretive Health, Inc.*, 657 F.3d 625, 631 (7th Cir. 2011); *Antonetti v. Abbott Lab'ys*, 563 F.3d 587, 592 (7th Cir. 2009) ("Title VII protects employees 'from retaliation for complaining about the types of discrimination it prohibits.'").

The statute does not protect any and all complaints that an employee makes about his or her job. The statute protects complaints about discrimination – that is, complaints that the company is treating someone badly based on their race.

"Although filing an official complaint with an employer may constitute statutorily protected activity under Title VII, the complaint must indicate the discrimination occurred because of sex, race, national origin, or some other protected class." *See Tomanovich v. City of Indianapolis*, 457 F.3d 656, 663 (7th Cir. 2006); *see also Miller v. Chicago Transit Auth.*, 20 F.4th 1148, 1155 (7th Cir. 2021) ("A complaint of discrimination is a protected activity under Title VII only if the discrimination is based on a protected characteristic like race."); *Liner v. FCA US LLC*, 2021 WL 4244750, at *6 (N.D. Ill. 2021) (granting summary judgment for the employer on a retaliation claim because plaintiff's complaint "made no reference to racial or any other form of discrimination prohibited by Title VII").

General complaints about management or employee benefits do not qualify as protected activities. "Statutorily-protected activity 'requires more than simply a complaint about some situation at work, no matter how valid the complaint might be.'" *Skiba v. Illinois Cent. R.R. Co.*, 884 F.3d 708, 718 (7th Cir. 2018) (quoting *Cole v. Bd. of Trs. of N. Illinois Univ.*, 838 F.3d 888, 901 (7th Cir. 2016)); *see also Miller v. Am. Fam. Mut. Ins.*, 203 F.3d 997, 1008 (7th Cir. 2000) (holding that a plaintiff did not engage in a protected activity where "[h]er complaints instead concerned a general displeasure with being paid less than her co-workers given her longer tenure and the fact that she had trained some of them"); *Davis v. Hickory Farms*, 2021 WL 2566762, at *4 (N.D. Ill. 2021) (holding that complaints of "unfair and overly critical treatment" were not protected activities); *Kim v. FNS, Inc.*, 2023 WL 6049913, at *8 (N.D. Ill. 2023) ("[T]he activity of [the plaintiff] taking a medical leave is not protected activity under Title VII.").

Reese did not come forward with evidence that the company fired him for engaging in protected activity. Reese never complained that the company had denied him benefits based on his race. *Id.* at ¶¶ 18–19. Reese complained about a lot of things, but racial discrimination wasn't one of them.

Instead, Reese made general complaints about his employee benefits. *See* Wicks Decl., at ¶ 18 (Dckt. No. 54-2). But general complaints about unfair treatment are not protected activities under Title VII. *See Cole*, 838 F.3d at 901; *Davis*, 2021 WL 2566762, at *4; *Kim*, 2023 WL 6049913, at *8. His "membership in a protected class, without anything more, is not enough to transform his general complaint about improper workplace practices into a complaint opposing race discrimination." *See Cole*, 838 F.3d at 901.

Causation is an insurmountable problem, too. Reese failed to produce evidence of a causal link between his complaints and his termination.

"A retaliation claim under Title VII requires a plaintiff to establish 'that his or her protected activity was a but-for cause of the alleged adverse action by the employer.'" *Gnutek v. Illinois Gaming Bd.*, 80 F.4th 820, 824 (7th Cir. 2023) (quoting *Univ. of Texas Southwestern Medical Center v. Nassar*, 570 U.S. 338, 362 (2013)). Reese must produce evidence that "complaining about prohibited discrimination" instigated the adverse employment action. *See Jaburek v. Foxx*, 813 F.3d 626, 633 (7th Cir. 2016) (quoting *Chaib v. Indiana*, 744 F.3d 974, 986 (7th Cir. 2014)).

"In making this showing, an employee may refer to direct evidence or circumstantial evidence such as 'suspicious timing, ambiguous statements of animus, evidence other employees were treated differently, or evidence the employer's proffered reason for the adverse action was

pretextual."' *Kline v. United Airlines, Inc.*, 2024 WL 3594643, at *12 (N.D. Ill. 2024) (quoting *Adebiyi v. S. Suburban Coll.*, 98 F.4th 886, 892 (7th Cir. 2024)).

Reese argues that "the timing of events strongly suggests retaliation." *See* Pl.'s Resp. in Opp'n. to Def.'s Mtn. for Summ. J., at 8 of 55 (Dckt. No. 59). Reese complained about his job in January, and Hub Group terminated him in February.

"While timing can support an inference of causation, it is rarely sufficient alone, especially where there is an intervening event and no evidence of pretext." *See Brown v. American Foods Group, LLC*, 2026 WL 94973, at *2 (7th Cir. 2026) (citation omitted); *see also Mobley v. Allstate Ins. Co.*, 531 F.3d 539, 549 (7th Cir. 2008) ("Evidence of temporal proximity, however, standing on its own, is insufficient to establish a causal connection for a claim of retaliation.").

"When 'there are reasonable, non-suspicious explanations for the timing' of the defendant's conduct, proximity in time is not enough to support a retaliation claim." *See Alley v. Penguin Random House*, 62 F.4th 358, 362 (7th Cir. 2023) (citation omitted). Here, the company had boatloads of reasons for letting Reese go.

If anything, the proximity in time cuts the other way. Hub Group fired Reese shortly after he barricaded himself in a room, turned off the lights, and refused to come out.

Reese provides "no direct evidence of but-for causation such as admissions of retaliatory animus by the decisionmakers." *See Kline*, 2024 WL 3594643, at *12. He doesn't provide any circumstantial evidence, either. *Id.*

Instead, the record demonstrates that Hub Group fired Reese for repeated insubordination, tardiness, and performance issues. Reese frequently arrived late to work, went

missing, disrespected coworkers, completed schoolwork during shifts, and took unauthorized breaks.

His final day was a curtain call in the theater of the absurd. Reese showed up late, refused to follow his supervisor's instructions, left his workstation, performed no work, barricaded himself in a room, sat in the dark, refused to come out, and went home early. *See* Def.'s Statement of Material Facts, at ¶¶ 49–59 (Dckt. No. 54).

On this record, no reasonable jury could conclude that the company retaliated against Reese for engaging in a protected activity. Hub Group is entitled to summary judgment on the retaliation claim.

## III.    Hostile Work Environment

The last claim is a hostile work environment claim.

A hostile work environment can constitute discrimination. An employer creates a hostile work environment when "the workplace is permeated with discriminatory intimidation, ridicule, and insult, that is sufficiently severe or pervasive to alter the conditions of the victim's employment and create an abusive working environment." *See Hambrick v. Kijakazi*, 79 F.4th 835, 842 (7th Cir. 2023).

To prove a claim, a plaintiff "must show that '(1) he was subject to unwelcome harassment; (2) the harassment was based on race (or another protected category); (3) the harassment was severe or pervasive to a degree that altered the conditions of employment and created a hostile or abusive work environment; and (4) there is a basis for employer liability.'" *See Beal v. Pac. Rail Servs., Inc.*, 647 F. Supp. 3d 636, 640 (N.D. Ill. 2022) (quoting *Gates v. Bd. of Educ. of the City of Chicago*, 916 F.3d 631, 636 (7th Cir. 2019)).

Harassing conduct must have a "racial character or purpose." *See Yancick v. Hanna Steel Corp.*, 653 F.3d 532, 544 (7th Cir. 2011). A plaintiff must "present sufficient evidence to permit a reasonable jury to find that the alleged harassment was based on his race." *See Abrego v. Wilkie*, 907 F.3d 1004, 1016 (7th Cir. 2018).

A number of factors come into play when assessing whether an environment is hostile, including "the frequency of the discriminatory conduct; its severity; whether it is physically threatening or humiliating, or a mere offensive utterance; and whether it unreasonably interferes with an employee's work performance." *See Hambrick*, 79 F.4th at 842–43.

Reese argues that Hub Group subjected him to a hostile work environment. He points to three pieces of evidence: (1) the February 4 incident; (2) the selective enforcement of rules; and (3) the denial of benefits. *See* Pl.'s Resp. in Opp'n. to Def.'s Mtn. for Summ. J., at 9–10 of 55 (Dckt. No. 59). They don't get him very far.

### A.     February 4

Reese believes that the company created a hostile work environment on February 4. That's the day when Reese showed up late, refused to work, hid in a room, turned out the lights, and refused to come out. He eventually left the building, and a few days later, the company showed him the door.

An employer doesn't create a hostile work environment by requiring an employee to do his or her job. "No reasonable jury could conclude that being assigned duties that were part of one's job description . . . amount[s] to a hostile work environment." *See Hobbs v. City of Chicago*, 573 F.3d 454, 464 (7th Cir. 2009).

By the same token, an employer doesn't create a hostile work environment by disciplining an employee for failing to do his or her job, without more. "Measured discipline for

legitimate rules violations and a single angry outburst does not constitute severe or pervasive conduct." *Adams v. City of Chicago*, 706 F. Supp. 2d 863, 880 (N.D. Ill. 2010) (collecting cases).

An employer does not create a hostile work environment simply because a supervisor is "short tempered," "hostile," "unfairly critical," and "disrespectful." *See Abrego*, 907 F.3d at 1015; *see also Hambrick*, 79 F.4th at 843 ("And having supervisors who are short tempered, hostile, unfairly critical, and disrespectful, does not amount to objectively offensive, severe, or pervasive conduct.") (cleaned up).

Getting into an argument at work, without more, isn't enough to give rise to a claim about a hostile work environment. A hostile work environment doesn't mean that the employee feels hostility from someone else.

Using swear words and salty language doesn't guarantee a claim, either. A supervisor's use of epithets or crude words does not create a hostile work environment unless a plaintiff introduces "evidence that his supervisors swore at him because he was black." *See Smith v. Illinois Dep't of Transportation*, 936 F.3d 554, at 561 (7th Cir. 2019).

Sometimes an incident on a single day can give rise to a hostile work environment claim, but it's not the norm. *See Jackson v. Cnty. of Racine*, 474 F.3d 493, 499 (7th Cir. 2007). "'[I]solated incidents (unless extremely serious) are not sufficient' to establish a hostile work environment claim." *See Jones v. Das*, 164 F.4th 1024, 1035 (7th Cir. 2026) (citation omitted).

A good example is *Smith v. Sheahan*, 189 F.3d 529 (7th Cir. 1999). There, a male coworker called the plaintiff a "bitch," threatened to "fuck [her] up," pinned her to a wall, and twisted her wrist so severely that he drew blood and damaged her ligaments. *See Smith*, 189

36

F.3d at 531–33. The Seventh Circuit held that that incident gave rise to a claim about a hostile work environment. *Id.* at 533.

The record at hand doesn't come close to creating a genuine issue of material fact. The record is empty when it comes to hostile treatment based on his race. There are no taunts, threats, smears, jokes, jabs, comments, disparagements, pranks, or anything in that neighborhood. The record doesn't even include any "immature and ignorant behavior" directed at Reese. *See Yancick*, 653 F.3d at 546.

The incident on February 4 cannot give rise to a claim about a hostile work environment. Reese had a meltdown, and nothing in the exchange that followed had anything to do with race.

The day started on a sour note. Reese once again arrived late for work. Weisberg informed Reese that he would report him to human resources. *See* Def.'s Statement of Material Facts, at ¶¶ 49–50 (Dckt. No. 54).

When Reese responded by requesting PTO, Weisberg said no. *Id.* at ¶ 52. And when Reese tried leaving anyway, Weisberg responded that leaving early would violate his final warning. *Id.* ¶ 53. Weisberg directed Reese to return to his desk. *Id.*

When Reese refused, Weisberg raised his voice. *See* Wicks Decl., at ¶ 20 (Dckt. No. 54-2). But Weisberg never touched or physically threatened Reese. *Id.*; *see also* Def.'s Statement of Material Facts, at ¶ 66 (Dckt. No. 54).

Wicks heard the argument over the phone, and never heard Weisberg mention Reese's race or use any derogatory language. *See* Wicks Decl., at ¶ 20 (Dckt. No. 54-2). In fact, Wicks never heard Weisberg so much as curse. *Id.* And when Wicks recommended that Weisberg let Reese leave, Weisberg complied. *See* Groszek Decl., Ex. 8, at 30 of 31 (Dckt. No. 54-3).

Reese came forward with no evidence that race played a role in that interaction. At deposition, Reese refused to characterize Weisberg's actions as racially motivated. *See* Reese Dep. Tr., at 223:25 – 224:23 (Dckt. No. 54-4); *see also* Reese Dep. Tr., at 69:11 – 70:3 (Dckt. No. 54-5).

Reese claims that Weisberg and security acted over the top. They "cornered [him] in a very aggressive manner and demanded that [he] give up his laptop." *See* Reese Decl., at ¶ 70 (Dckt. No. 62). Reese also believes that Weisberg "threatened" him by saying that leaving the building would violate his written warning. *Id.* at ¶ 73.

At worst, Weisberg disciplined Reese for "legitimate rules violations" while having "a single angry outburst." *See Adams*, 706 F. Supp. at 880. Reese showed up late and refused to follow his supervisor's instructions. While Weisberg raised his voice, Reese provides no evidence that Weisberg yelled "at him because he was black." *See Smith*, 936 F.3d at 561.

Based on the undisputed facts, no reasonable jury could find that the February 4 incident created a hostile work environment.

## B. Selective Enforcement of the Rules

Next, Reese contends that Hub Group created a hostile work environment by selectively enforcing workplace rules. *See* Pl.'s Resp. in Opp'n. to Def.'s Mtn. for Summ. J., at 9 of 55 (Dckt. No. 59).

Reese "believes" that he "was the only afterhours Planner forbidden from and given a written violation for conducting personal work during working hours because [he] was African-American." *See* Reese Decl., at ¶ 16 (Dckt. No. 62). That conclusory statement comes from his declaration, not the statement of additional facts as required by Local Rule 56.1. So strictly speaking, it counts for nothing because he didn't comply with the Local Rules.

Even so, that statement is not enough to create a genuine issue of material fact. Reese provides no evidence that other, non-black employees violated rules without receiving any reprimand. *See Triplett v. Starbucks Coffee*, 2011 WL 3165576, at *6 (N.D. Ill. 2011). And the enforcement of reasonable workplace rules does not create a hostile work environment. *See Ballatore v. Fairmont Hotels & Resorts, Inc.*, 2004 WL 419907, at *9 (N.D. Ill. 2004).

### C.     The Denial of Benefits

Finally, Reese claims that the company did not provide him the benefits that it promised. He complains about the lack of pay, the lack of a bonus, the lack of PTO, the lack of holidays, the lack of telework, and so on.

This Court will put to one side whether Reese is right about the denial of benefits. (He isn't.) Reese needed to come forward with evidence that the company denied him benefits based on his race. *See Mahran v. Advoc. Christ Med. Ctr.*, 12 F.4th 708, 715 (7th Cir. 2021). Suffice it to say that Reese made no such showing.

Viewing the record as a whole, no reasonable jury could find that the company created a hostile work environment against Reese. If anything, Reese seemed hostile to working.

### Conclusion

For the foregoing reasons, Defendant Hub Group's motion for summary judgment is granted.


Date:   February 27, 2026

Steven C. Seeger
United States District Judge